NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

PARADISE L., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, A.L., *Appellees*.

No. 1 CA-JV 20-0062
FILED 3-4-2021

Appeal from the Superior Court in Coconino County
No. S0300AD201900011
The Honorable Elaine Fridlund-Horne, Judge

**AFFIRMED**

COUNSEL

Law Office of Florence M. Bruemmer PC, Anthem
By Florence M. Bruemmer
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Lauren J. Lowe
*Counsel for Appellee Department of Child Safety*

---

## MEMORANDUM DECISION

Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge Maria Elena Cruz joined.

---

**H O W E**, Judge:

**¶1** Paradise L. ("Mother") appeals the juvenile court's order terminating her parental rights to A.L. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

**¶2** A.L. was born substance exposed to marijuana in August 2014. As a result, the Department of Child Safety petitioned for dependency, removed A.L. from Mother's care, and offered her services including intensive in-home services, random urinalysis testing, substance-abuse assessment and treatment, behavioral health treatment, and transportation. Mother minimally participated in services at first but once she fully participated, she regained custody of A.L., and the dependency was dismissed in March 2016.

**¶3** A few months after regaining custody of A.L., Mother discharged herself from behavioral-health treatment. About 15 months later, she had a psychotic episode, tested positive for marijuana and methamphetamine, and was later admitted to a mental health facility.

**¶4** The Department removed A.L. from Mother's care again and petitioned for dependency a second time. Mother was resistant to the mental health and substance abuse treatment but eventually participated in services. Thereafter, the Department placed A.L. back in her care and the case proceeded as an in-home dependency in May 2017, and the second dependency was later dismissed in November 2017. That same month, Mother was set up with an aftercare plan that recommended that she maintain medication requirements and follow behavioral health recommendations. But shortly thereafter, Mother discharged herself from mental health treatment and stopped taking her prescribed medication.

**¶5** As a result, Mother experienced another psychotic episode in February 2018. She was walking down the street with A.L., talking to herself, and repeatedly hit herself. Police responded and took A.L. to his grandparent's house and took Mother to a mental health facility. After eight

days in the facility, Mother checked herself out against medical advice and experienced another psychotic episode the following day while in A.L.'s presence. Mother was behaving erratically and A.L. was non-responsive and lethargic. Mother told police that she had "smoked earlier [that] []day" and police believed that A.L. may have been lethargic because of marijuana exposure. The Department again removed A.L. from Mother's care and, in March 2018, petitioned for dependency a third time.

¶6            When A.L. was removed from Mother's care, the Department case manager told Mother that fully engaging in services right away was important because the Department was not going to go through a fourth dependency. Just a few days later, however, Mother experienced another psychotic episode at a hotel. Police responded and arrested Mother after she "kneed" one of the responding officers. Her erratic behavior continued in jail and she was taken to a mental health facility. Mother admitted to being under the influence of marijuana at the time. While at the mental health facility, Mother did not consistently take her medication and continued to experience psychotic symptoms. She eventually started to take her medication more consistently and was released from the facility. Shortly after she was released, she received a serious mental illness evaluation and—despite denying having any issues—in April 2018, she was diagnosed as having a serious mental illness.

¶7            After Mother was released from in-patient treatment, she continued outpatient psychiatric treatment. The Department referred Mother for other services including a psychological evaluation, inpatient substance abuse treatment, outpatient substance abuse treatment, random urinalysis testing, individual therapy, family therapy, parent-aide services, dialectical behavior therapy, and supervised visitation. With the exception of dialectical behavior therapy, Mother participated in the services the Department offered minimally and inconsistently.

¶8            In October 2018, Dr. James Thal completed a mental health evaluation of Mother, during which she explained that she had mental health issues dating back to adolescence and self-medicated using marijuana since high school. Mother disagreed that she had bipolar disorder and said that her psychotic episodes were caused by the medications that she was given. She said that her medications were not helpful and that she preferred self-medicating with marijuana. He opined that Mother's "severe mood instability, break with reality, and drug use ha[d] interfered significant[ly] with her ability to provide safe and effective parenting of her child." He diagnosed Mother with bipolar disorder with psychosis, borderline personality disorder, post-traumatic stress disorder,

an unspecified depressive disorder, anxiety disorder, stimulant-use disorder, and marijuana-use disorder.

¶9            In December 2018, Mother was arrested while she was outside someone's apartment and charged with disorderly conduct. She was behaving erratically and saying that someone was trying to shoot her. Mother was also intoxicated and under the influence of marijuana at the time and police believed that she was mentally unstable.

¶10          In January 2019, the Department moved to terminate Mother's parental rights to A.L. based on chronic substance abuse, recurrent-removal within 18 months, and mental health grounds. That same month, Mother started fully participating in dialectical behavior therapy. She also participated in another substance abuse assessment but minimized her history of methamphetamine use and did not disclose the recent incidents involving her alcohol use. The Department recommended that Mother "not use marijuana" because "marijuana use can contribute to psychotic episodes." Despite this recommendation, Mother continued to use and test positive for marijuana.

¶11          In March 2019, Mother signed a six-month deferred prosecution agreement in her disorderly conduct case. Pursuant to the agreement, the disorderly conduct charge would be dismissed if Mother underwent a mental health evaluation and followed the recommended treatment for six months. After entering the agreement, Mother participated in her mental health and substance abuse services more consistently. She completed the early recovery and relapse prevention portions of her substance abuse treatment. During this time, Mother continued to test positive for marijuana and had a valid medical marijuana card even though the Department expressed concern about the risk marijuana use posed to her mental health. She also tested positive for alcohol in May 2019, even though she was prohibited from consuming alcohol as part of her court-ordered mental health treatment.

¶12          In July 2019, the Department amended its petition to terminate Mother's parental rights to include that A.L. had been in an out-of-home placement for a cumulative period of 15 months. A.L.'s behavior was extreme after visits with Mother. A trauma therapist found that A.L. was disassociated, angry, and agitated after a visit with Mother. A.L. also displayed sexualized behavior, engaged in self-harm, and killed a guinea pig and a chihuahua. A.L.'s behavior improved after he spent time with a prospective relative placement and had limited contact with Mother. Therefore, in August 2019, A.L. was placed with those relatives and the

juvenile court temporarily suspended Mother's visitation until A.L.'s behavior stabilized.

¶13          In September 2019, the juvenile court held a termination hearing. The Department's case manager testified that by September 2018, Mother had minimally participated in the offered services. She opined that Mother was unable "to parent at this time due to her substance-abuse" because every urinalysis test was positive for marijuana despite the Department expressing concern to her about her marijuana use. The case manager further testified that the Department and Mother's physician recommended that she stop using marijuana because it may induce psychosis.

¶14          The case manager testified that termination of Mother's parental rights was in A.L.'s best interests because his current placement is willing to adopt him, is meeting his needs, and A.L. would benefit from the stability since he has been in out-of-home care for nearly half his life. She further testified that A.L. would be harmed if Mother's parental rights were not terminated because he would be exposed to Mother's continued substance abuse.

¶15          Dr. Thal testified that he also had concerns about Mother's marijuana use and that marijuana can cause psychotic episodes. He opined that as of October 2018, Mother was not able to parent her child. He testified that given Mother's previous engagement in services during the first two dependencies, followed by her lack of engagement after the dependencies were dismissed did not mean that A.L. was safe in her care now that she had engaged in services once again.

¶16          Eve Coffman, Mother's therapist, testified that even though Mother stated that she thinks more clearly when not using marijuana, she continues to use marijuana "to this day" and that Mother told her that "she could not imagine a life without it." She also testified that she has no way of knowing—despite Mother's current behavioral changes—whether Mother has made any lasting changes.

¶17          Mother's therapist from her dialectical behavior therapy group testified that Mother was doing exceptional in the program and has made behavioral changes including managing her emotions. She also testified, however, that dialectical behavior therapy does not help people who are experiencing psychotic episodes and that a person who is doing well in that program could still have psychotic episodes.

¶18        Mother testified that she had completed dialectical behavior therapy, substance abuse treatment, and started eye movement desensitization and reprocessing therapy. When asked if she learned anything in her treatment to help her manage her mental health issues, she testified that her dialectical behavior therapy "in itself has been one of the biggest helps" for her along with individual therapy, but added that "[i]t's not so much the medication." She testified that she has a medical marijuana card and has not been told to stop using marijuana. She further testified that after previous dependencies, not taking her medication was sometimes beneficial and that the medication is what caused her psychotic episodes. But she said that she had no intention of stopping her medication now. She also testified that she did not believe that she has a mental health diagnosis that can cause psychosis, that she does not have bipolar disorder anymore, and that she just has a general anxiety disorder. She admitted, though, that when she experiences a psychotic episode while A.L. is in her care, those psychotic episodes are harmful to him.

¶19        At the conclusion of the Department's evidence, the court granted Mother's directed verdict motion on the chronic substance abuse ground, finding that it did not have clear and convincing evidence that Mother abused dangerous drugs or that her methamphetamine use would continue for a prolonged indeterminate period.

¶20        During the trial, counsel for the Department objected several times to Mother's courtroom conduct. The court later responded that it had already admonished her a couple of times and that her behavior was "not prejudicing the State's case because the [c]ourt is relying on evidence not any head-nodding by anybody or statements being made" and that the court "does not consider that as evidence" and does not give any weight to it.

¶21        Also during the trial, one of Mother's witnesses, Mary Beth Laurano, a nurse at the facility where Mother received mental health treatment, was discovered outside the courtroom trying to listen to the proceedings. The Department argued that Laurana should be precluded from testifying at trial for violating the rule of exclusion. The court stated that it had not admonished the witnesses on the rule of exclusion and Mother's counsel stated that he had not told the witnesses that they were not allowed to listen to the proceedings or talk to other witnesses. The court therefore said that it did not plan to preclude her from testifying. The court then called all the witnesses into the courtroom and explained the rule of exclusion to them and stated that if any of them violated the rule, it could "impose as a sanction [that] you're not allowed to testify at all."

¶22     When the court questioned Laurano about trying to listen to the proceedings, she denied trying to listen to the proceedings and said that she only got up and walked around because she had issues sitting for long periods of time. She also denied hearing any of the witnesses testifying but stated that she "could hear mumbling" every once in a while. She further stated that no one had come up to her and asked her what she was doing other than another witness. Based on her answers, the court stated that it was unsure that she was the correct witness seen outside the courtroom and asked her to step outside.

¶23     After leaving the courtroom, court staff heard Laurano tell the other witnesses about what the court had just questioned her on. Meanwhile, the court staff member who had observed Laurano trying to listen outside the courtroom identified her as the witness the court had just questioned. The court determined that Laurano had not only lied, but then immediately violated the rule of exclusion that was just explained to her by discussing what had happened with the other witnesses outside the courtroom. The court therefore precluded her from testifying.

¶24     After the trial, the juvenile court terminated Mother's parental rights based on 15 months' out-of-home placement, recurrent-removal within 18 months, and mental health grounds. It found that termination was in A.L.'s best interests because he was adoptable, and that he had "suffered trauma upon trauma such that his bond with Mother is based upon that trauma." Mother timely appealed.

**DISCUSSION**

**1. Due Process**

¶25     Mother argues that she was denied due process when the trial court precluded Laurano from testifying. We review the juvenile court's evidentiary rulings for an abuse of discretion, *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 60 ¶ 19 (App. 2015), which is an exercise of discretion that is manifestly unreasonable, exercised on untenable grounds, or for untenable reasons, *Doherty v. Leon*, 249 Ariz. 515, 521 ¶ 17 (App. 2020).

¶26     The juvenile court did not abuse its discretion by precluding Laurano from testifying at trial. At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Ariz. R. Evid. 615. Remedies for violating the rule of exclusion include "contempt, allowing cross-examination regarding the violation, instructing the jury regarding the violation, or under the right circumstances, precluding the testimony." *Spring v. Bradford*, 243 Ariz. 167, 174 ¶ 29 (2017).

¶27 The parties here invoked the rule of exclusion. Laurano was seen trying to listen to the proceedings outside the courtroom. While neither the court nor counsel told Laurano that she could not listen to the proceedings or talk to other witnesses, she lied to the court when she was questioned on the matter. And despite the court's admonishing her about the rule of exclusion and warning she could be precluded from testifying if she violated it, she immediately went outside the courtroom and told other witnesses what the court had just questioned her on. No other remedy was appropriate under these circumstances. This case involved no jury and cross-examination about the violation was futile as she had already lied to the court in the first instance. The juvenile court did not abuse its discretion by precluding Laurano. Moreover, Mother has not shown that preclusion of Laurano prejudiced her because she has not identified what Laurano's testimony would have been.

¶28 Mother also argues that the Department's comments during the trial denied her due process. She contends that the Department constantly objected to and made comments about her behavior during trial, that the Department tried to cast her in a bad light, and that counsel's statements amounted to vouching. As an example, Mother points to counsel's closing argument during which she stated that she "could not tell you how many times [she] asked for contempt sanctions" and that in her 30 years of practice, she has "never seen this kind of behavior."

¶29 The Department's objections to Mother's trial behavior, and counsel's comments during closing argument did not deny Mother due process. The trial court stated that "the [c]ourt is relying on evidence not any head-nodding by anybody or statements being made" and that the court "does not consider that as evidence" and does not give any weight to it. And Mother never objected to counsel's closing argument, which is not evidence. *See Murray v. Murray*, 239 Ariz. 174, 179 ¶ 18 (App. 2016). Mother points to no evidence that the court considered counsel's objections or comments when terminating her parental rights. The court's ruling expressly listed all the evidence considered and does not mention her trial behavior or counsel's closing argument. Mother was not denied due process and was not prejudiced by the Department's objections or counsel's closing argument.

## 2. Termination of Mother's Parental Rights

¶30 Mother argues that no reasonable evidence supports the juvenile court's termination order. We review a juvenile court's termination order for an abuse of discretion. *E.R.*, 237 Ariz. at 58 ¶ 9. We will affirm an

order terminating parental rights so long as reasonable evidence supports the order. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93 ¶ 18 (App. 2009). To terminate parental rights, a court must find by clear and convincing evidence that at least one statutory ground in A.R.S. § 8–533 has been proven and must find by a preponderance of the evidence that termination is in the child's best interests. *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286 ¶ 15 (App. 2016). "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 ¶ 4 (App. 2002).

**¶31** To terminate parental rights for 15 months in an out-of-home placement, the juvenile court must find clear and convincing evidence that (1) the Department made diligent efforts to provide appropriate reunification services, (2) the child has been in an out-of-home placement for a cumulative total period of 15 months or longer pursuant to court order, (3) the parent has been unable to remedy the circumstances that caused the child to be in an out-of-home placement, and (4) a substantial likelihood exists that the parent will be incapable of exercising proper and effective parental care and control in the near future. A.R.S. § 8–533(B)(8)(c).

**¶32** Reasonable evidence supports the juvenile court's termination of Mother's parental rights. The Department provided appropriate reunification services including inpatient and outpatient mental health treatment, a psychological evaluation, inpatient substance abuse treatment, outpatient substance abuse treatment, random urinalysis testing, individual therapy, family therapy, parent-aide services, dialectical behavior therapy, and supervised visitation. A.L. was removed from Mother's care in March 2018—the third dependency involving A.L.—and had been in an out-of-home placement for more than 15 months by the termination hearing.

**¶33** Mother has also been unable to remedy the circumstances that caused the out-of-home placement and a substantial likelihood exists that she will be incapable of exercising proper and effective parental care in the near future. While Mother consistently engaged in mental health treatment and substance abuse treatment, she only did so beginning in March 2019, after the Department had already petitioned to terminate her parental rights and after she was court-ordered to complete six months of mental health treatment in her criminal case. Because she had two prior dependencies during which she had engaged in services and then disengaged when the dependencies were dismissed, Mother needed to

show that she could manage her mental health long-term. This is why the Department told her that she needed to fully engage in services in March 2018. Despite this warning, Mother did not fully engage in services until a year later. As a result, Mother had not shown that she could comply with her mental health treatment long-term by the time of the termination hearing.

¶34        Instead, the evidence showed that the third dependency proceeded like the first two. Mother minimally participated in services at first, experienced multiple psychotic episodes months after services were first offered, and eventually engaged in services. While Mother testified that she did not intend to stop taking her medication after this dependency, she testified that her dialectical behavior therapy and individual therapy were helping her manage her mental health issues and that "[i]t's not so much the medication." But her dialectical behavior therapist testified that psychotic episodes are a medical problem and that Mother could still experience a psychotic episode while participating in the therapy program. Mother's testimony that "[i]t's not so much the medication" helping her manage her mental health shows that—much like the first two dependencies—she would likely stop taking her medication if A.L. were returned to her and the dependency were dismissed.

¶35        Moreover, despite being diagnosed with marijuana use disorder and told that she should not smoke marijuana because it can trigger a psychotic episode—similar to the previous psychotic episodes that Mother experienced while under the influence of marijuana—Mother continues to smoke marijuana and has said that she cannot "imagine a life without it." As a result, Mother's continued marijuana use risks that she will have another psychotic episode, which she admitted is harmful to A.L. Reasonable evidence supports the juvenile court's finding that Mother has been unable to remedy the circumstances that caused A.L.'s out-of-home placement and that a substantial likelihood exists that she will be incapable of exercising proper and effective parental care in the near future.

¶36        Mother argues that the Department did not make diligent efforts to offer her reunification services because it did not offer her family counseling and did not offer her dialectical behavior therapy until the third dependency. She contends that if it had been offered in the first or second dependency, no third dependency would have happened. The Department, however, is not required to offer every conceivable service. *See Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 235 ¶ 15 (App. 2011). Nevertheless, it offered Mother both inpatient and outpatient mental health treatment, a psychological evaluation, inpatient and outpatient substance abuse

treatment, random urinalysis testing, individual therapy, family therapy, parent-aide services, dialectical behavior therapy, and supervised visitation. The Department made diligent efforts to offer Mother reunification services. Mother's argument that this dependency would not have happened had dialectical behavior therapy been offered sooner is speculative and ignores her own failure to follow her treatment plan during the two first dependencies.

¶37        Mother argues next that the Department failed to show that she was unable to discharge parental responsibilities because she had been fully engaged in services for approximately six months by the termination hearing. While Mother fully engaged in services starting in March 2019, she only did so after the Department moved to terminate her parental rights and after she was court-ordered to complete six months of mental health treatment in her criminal case. Mother also testified that "[i]t's not so much the medication" that is helping her manage her mental health, showing that—like the first two dependencies—she still does not believe her medication is helpful. She was also diagnosed with marijuana use disorder and was told that she should not smoke marijuana because it can trigger a psychotic episode. Despite this warning, Mother continues to deny that she has a marijuana addiction—even though she has been self-medicating with marijuana since she was a teenager—and continues to smoke, thereby risking that she will have another psychotic episode. Reasonable evidence supports the juvenile court's finding that she is unable to discharge parental responsibilities.

¶38        Mother argues next that termination of her parental rights was not in A.L.'s bests interests because no evidence was presented that A.L. would be harmed by a relationship with her. Termination of parental rights is in a child's best interests if the child will benefit from the termination or will be harmed if the relationship continues. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150 ¶ 13 (2018). In determining whether the child will benefit from termination, relevant factors to consider include whether the current placement is meeting the child's needs, an adoption plan is in place, and if the child is adoptable. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3–4 ¶ 12 (2016).

¶39        Reasonable evidence supports the juvenile court's finding that termination of Mother's parental rights was in A.L.'s best interests. After visits with Mother, A.L. was angry, agitated, and showed extreme behaviors such as hitting himself, biting himself, killing animals, and throwing tantrums lasting 12 hours. A.L. was present when Mother experienced her psychotic episodes and Mother admitted that those

incidents were harmful to him. Finally, A.L. was in an adoptable placement with relatives and his behavior improved while in their care. Reasonable evidence supports the juvenile court's termination order and we need not consider the other termination grounds. *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251 ¶ 27 (2000).

## CONCLUSION

¶40      For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA